EDMUND G. BROWN JR.
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
GREGORY A. OTT
Deputy Attorney General
State Bar No. 160803
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5964
 Fax:  (415) 703-1234
 E-mail:  Gregory.Ott@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **BARBARA ANN SALDINGER,** <br><br> Petitioner, <br><br> v. <br><br> **SANTA CRUZ COUNTY SUPERIOR COURT,** <br><br> Respondent. | CV 10-3147 SBA <br><br> **OPPOSITION TO MOTION FOR EMERGENCY STAY OF JAIL SENTENCE** |

**INTRODUCTION**

On July 19, 2010, petitioner Barbara Ann Saldinger filed a petition for writ of habeas corpus in this Court, challenging the constitutionality of her March 2007, misdemeanor conviction in Santa Cruz County for brandishing an imitation firearm, Cal. Penal Code § 417.4. Petitioner apparently has outstanding, as a condition of her probation, service of a sixty-day jail term. On July 20, 2010, petitioner filed a Notice of Motion and Motion for Emergency Stay of Petitioner's 60 Day Jail Sentence Pending Decision of her Petition for a Writ of a Habeas Corpus (hereafter "Mtn. for Stay").

Respondent has not been ordered to appear and/or show cause in this matter. Accordingly, at the Court's request, respondent appears here for the limited purpose of responding to petitioner's motion for an emergency stay. Because petitioner has not met her burden of showing she is entitled to a stay under the factors set forth in *Hilton v. Braunskill*, 481 U.S. 770 (1987), her request to stay her jail term should be denied.

## STATEMENT OF THE CASE

On March 7, 2007, a Santa Cruz County Superior Court jury convicted petitioner of brandishing an imitation firearm, a misdemeanor. Cal. Penal Code § 417.4. The jury acquitted petitioner of brandishing a (real) firearm, and resisting an officer. Cal. Penal Code §§ 417, 148(a)(1). On April 25, 2007, the trial court sentenced petitioner to thirty-six months of probation, one condition of which was service of a sixty-day jail term.

On May 13, 2010, the appellate division of the Santa Cruz County Superior Court affirmed petitioner's judgment on direct review. Petition Exh. A; *see* Cal. Penal Code § 1466(2). On June 23, 2010, the California Court of Appeal denied petitioner's request to transfer her case to the court of appeal from the appellate division of the superior court. Petition Exh. D; *see* Cal. Penal Code § 1471.

On July 1, 2010, petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (No. S184122). That court denied the petition on July 14, 2010.

On July 19, 2010, petitioner filed the instant petition. On July 20, 2010, she filed a motion to stay execution of her sixty-day jail term.

## STATEMENT OF THE FACTS[1]

On January 17, 2006, Santa Cruz County Sheriff's deputies responded to a call from a resident who was being threatened by a neighbor carrying a rifle. 2RT 486. The deputies were

---

[1] We note at the outset petitioner has provided no record in support of her motion, despite possessing a copy of the record. Petition at 2 n.2. While ordinarily, respondent provides the record when answering a petition on the merits, Rule 5 Governing Section 2254 Cases, respondent has not been ordered to answer, and this is an "emergency" motion expedited at petitioner's urging. Undersigned counsel does not, in any event, presently have a copy of the record, since respondent was not represented by the Attorney General on direct appeal in superior court. We nonetheless are able to cite to the record with the assistance of the Santa Cruz County District Attorney's Office, who has requested a copy of their record from storage.

1 dispatched to 24550 Highway 17, property owned by Janette Magoc and her brother, Jack Bloxham. 1RT 161-62; 2RT 486. Petitioner and her husband, Todd Saldinger, own the adjoining property at 17123 Laurel Road. 5RT 1134.

At the time of the incident, petitioner and her husband were involved in an ongoing boundary dispute with Mr. Bloxham and Ms. Magoc. 5RT 1130, 1138-41. Ms. Magoc, petitioner and petitioner's husband all testified at trial that a line of cedar trees separating petitioner's property from Ms. Magoc and Mr. Bloxham's property was the agreed-upon temporary boundary line. 1RT 170; 4RT 888; 5RT 1136. To the side of the properties was a parcel of land that Ms. Magoc believed her grandmother had purchased to expand the back yard. 1RT 171. Petitioner and her husband believed the parcel was theirs and had begun excavating it to install a water tank. 5RT 1137; 4RT 878. Mr. Bloxham had noticed that petitioner and her husband had already excavated a flat area on the parcel, and was very concerned. 1RT 170. That piece of property became part of the property in dispute. 1RT 172; 5RT 1138.

On January 17, 2006, Ms. Magoc hired Barney Wagner of Summit Tree Service to cut down five or six trees.[2] 1RT 172. That afternoon, Ms. Magoc and her friend, Linda Nikiforak, were walking around Magoc's property. RT 174. They then climbed down into the excavated flat portion of land. 1RT 178-79. At no time did Ms. Magoc or Ms. Nikiforak cross over the line of cedar trees onto petitioner's property.[3] 1RT 177-78. As Ms. Magoc and Ms. Nikiforak stood on the property petitioner had excavated, petitioner suddenly started screaming and walking towards them. 1RT 180. Petitioner was screaming at the top of her lungs and walking aggressively. 1RT 181. Petitioner screamed, "Stop those fucking saws. They're . . . bothering my horses." 1RT 185. Petitioner did not have a rifle in her hands. 1RT 184. Ms. Magoc looked at Ms. Nikiforak and they turned around and immediately walked away. 1RT 186-87. Petitioner's husband confirmed that Ms. Magoc and Ms. Nikiforak left, just like petitioner told them to do. 5RT 1058; 1062.

---

[2] The trees being cut were on the Magoc property, not petitioner's property or the disputed property.
[3] As indicated, the excavated portion of land was adjacent to both properties.

On the way back to her house, Ms. Magoc heard a noise, a crashing through the trees, coming from the back of her property. 1RT 188-89. When she turned, she saw petitioner coming towards her and Ms. Nikiforak holding a gun. 1RT 189. Petitioner was approximately seventeen feet past the line of trees marking the boundary between the properties on Ms. Magoc's property; i.e., petitioner was on Magoc's property. 1RT 189, 190. Petitioner was holding the gun with her left hand at chest level with her elbow elevated and her right hand at shoulder level, pointing towards the right. 1RT 193. Petitioner was holding the gun in a menacing way. 2RT 323. She was screaming at the top of her voice and was visibly enraged. 1RT 194. Ms. Magoc testified that petitioner screamed, "Stay off my property. If you—if this is my property, if you come on my property again, I'm going to shoot you." 1RT 194. Ms. Magoc was afraid petitioner was going to shoot her because petitioner was holding a gun and shouting at her. 1RT 197. It was the most terrifying event of Ms. Magoc's life. 1RT 200. Ms. Magoc hurried inside and called the police because she was concerned she was still in danger. 1RT 198.

Ms. Nikiforak testified that while she and Ms. Magoc were on a walk, petitioner suddenly appeared and screamed that they were on her property and should get out. 2RT 367. Petitioner appeared furious from her stance, body language, screaming and shaking of petitioner's head and hands. 2RT 369. Ms. Nikiforak was stunned by petitioner's actions. After she and Ms. Magoc began to walk back to the house, petitioner came back out of the trees holding a gun. 2RT 372. Petitioner walked past the tree line towards the women. 2RT 376-77. Petitioner was holding the gun across her body and pointed up. 2RT 374. Ms. Nikiforak was familiar with BB gun rifles and believed that petitioner's gun was real. 2RT 374. Petitioner screamed, "Stay off my property. If you come on my property again, you're trespassing and I have the right to shoot." 2RT 372. Ms. Nikiforak was scared to death. 2RT 377.

Mr. Wagner testified that as he was working on removing several trees from the property, he saw Ms. Magoc and Ms. Nikiforak walking towards Magoc's house. 2RT 420. He was about seventy feet up in the pine tree. 2RT 420. As he watched them, Mr. Wagner saw petitioner come out from behind a line of trees. 2RT 421. Petitioner walked approximately thirty feet away from the tree line onto Magoc's property. 2RT 433. Mr. Wagner saw petitioner holding a rifle saying,

4

1    "This is private property, if you come onto this property again, I have the right to shoot you and
2    I'll shoot you." 2RT 421.  Petitioner was talking in a very loud voice and seemed angry.  2RT
3    425.  Mr. Wagner was nervous because petitioner seemed very angry and had a gun in her hands.
4    2RT 468.  Mr. Wagner told Deputy MacDonald that petitioner was acting "just crazy and
5    enraged." 4RT 836.

6    　　　Petitioner's husband Todd Saldinger testified that on January 17, 2006, he saw Ms. Magoc
7    and Ms. Nikiforak towards the back of the flat pad, at the back edge or a little above the back
8    edge.  4RT 841.  They were wearing long coats and did not appear to have any weapons.  5RT
9    1012.  He did not feel threatened by the two women because they didn't speak directly to him or
10   petitioner or cause action directly toward them that was threatening.  5RT 1038-39.  When he first
11   saw them he was holding a BB rifle and yelled at them to get off his property.  4RT 906.
12   Petitioner also yelled at the women, screaming, "You're trespassing, get off our property." 4RT
13   906-07.  Mr. Saldinger then handed the BB gun to petitioner.  4RT 909.  Mr. Saldinger and his
14   wife then walked up onto Ms. Magoc's property and violated the temporary boundary agreement
15   between the parties: "Yeah, we were very upset and, you know, I wish we hadn't done that."
16   5RT 105962.  Petitioner walked farther onto the Magoc property than Mr. Saldinger; she walked
17   about ten to twelve feet onto the Magoc property after the women.  5RT 1059-60.  Mr. Saldinger
18   stated that Ms. Magoc and Ms. Nikiforak had turned around and begun walking back to Ms.
19   Magoc's residence.  5RT 1058.  He also testified that petitioner, holding the BB gun, yelled at the
20   women again.  4RT 916.  Mr. Saldinger did not remember what petitioner said.  5RT 1037.  Mr.
21   Saldinger did not remember how petitioner was holding the BB gun.  5RT 1055.

22   　　　Petitioner testified at trial in her defense.  She testified that on January 17, 2006 she was
23   very stressed and angry because her horses were not calm.  5RT 1156.  Petitioner's attention was
24   drawn to Ms. Magoc and Ms. Nikiforak who were "moving their arms around in front of them.
25   The sense I got is maybe they were pointing things out." 6RT 1197.  They were standing on the
26   flat, excavated area.  6RT 1201.  Petitioner yelled and screamed at Ms. Magoc and Ms. Nikiforak
27   to leave the property when she first saw them down by the horses.  5RT 1155, 1211.  Petitioner
28   conceded that her own yelling would scare her horses and that yelling and screaming could cause

5

the horses to buck, jump, and do all sorts of things that were a danger to petitioner's safety. 5RT 1218-19. Ms. Magoc and Ms. Nikiforak did leave the flat area as petitioner and her husband started walking up the property. 5RT 1161. Petitioner didn't think Ms. Magoc or Ms. Nikiforak said anything back to petitioner when she screamed at them. 6RT 1214. Petitioner was carrying the BB gun as she walked up the hill towards Ms. Magoc and Ms. Nikiforak. 5RT 1160. By the time petitioner got up the hill from her property, Ms. Magoc and Ms. Nikiforak "were largely gone from the property" because "they were a ways ahead of us." 5RT 1184. Nevertheless, petitioner walked onto the Magoc/Bloxham side of the tree line and conceded she was maybe a couple of feet beyond the boundary line. 5RT 1164; 6RT 1235. Petitioner also testified that she could not remember exactly what she said to Ms. Magoc and Ms. Nikiforak. 5RT 1164. Petitioner agreed that the BB gun looked like a real gun. 5RT 1180. Petitioner could not remember how she was holding the BB gun, but believed she was carrying it with two hands. 5RT 1189, 1257.

At the time of the brandishing, Ms. Magoc testified that petitioner had stood approximately seventeen feet past the line of trees marking the boundary between the properties onto the Magoc property. 1RT 189-90. Ms. Nikiforak testified that petitioner had walked out past the tree line onto the Magoc property. 2RT 376-77. Mr. Wagner affirmed that he too saw petitioner walk out of the tree line. 2RT 421. Mr. Wagner stated that she was thirty feet past the tree line onto the Magoc property. 2RT 433. Even Mr. Saldinger stated that petitioner walked onto the Magoc property after Ms. Magoc and Ms. Nikiforak. 5RT 1060. In fact, Mr. Saldinger said that his wife walked ten to twelve feet onto the Magoc property as she held the BB gun in her hands. 5RT 1060. Petitioner herself conceded she could have been a couple of feet beyond the boundary. 6RT 1235.

**PETITIONER FAILS TO SHOW JUSTIFICATION TO STAY HER JAIL TERM**

Under *Hilton v. Braunskill*, 481 U.S. at 776,[4] a federal court must consider the following factors in deciding whether to issue a stay:

---

[4] *Hilton* arose in the context of a federal habeas petitioner who had been *granted* relief in the district court, and was seeking release on bail pending the state's appeal. *See Hilton v.*
(continued...)

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Petitioner fails to meet her burden of demonstrating a stay should issue.

## I. PETITIONER IS UNLIKELY TO SUCCEED ON THE MERITS

Petitioner raises three claims in her petition. She has virtually no chance of success on any of them.

This Court should evaluate petitioner's chances of success through the lens of 28 U.S.C. § 2254. Under § 2254(d), petitioner will bear the burden of showing that the California Supreme Court unreasonably applied Supreme Court holdings in rejecting her claims. 28 U.S.C. § 2254(d)(1); *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

### A. Petitioner Had No Right To Her Requested Instruction

Petitioner contends she was deprived of her constitutional right to present a defense, because the trial court denied her request to instruct the jury on her theory of defense. Petition at 6. Specifically, at trial she asked the court to instruct the jury pursuant to a CALCRIM No. 3475, which provides:

> The (owner/lawful occupant) of a (home/property) may request that a trespasser leave the (home/property). If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to (the (home/property)/ [or] the (owner/ [or] occupants), the (owner/lawful occupant) may use reasonable force to make the trespasser leave.
>
> *Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.
>
> [If the trespasser resists, the (owner/lawful occupant) may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.]
>
> When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

---

(…continued)
*Braunskill*, 481 U.S. at 772. The *Hilton* factors have nonetheless been imported into various contexts where a stay is requested.

> The People have the burden of proving beyond a reasonable doubt that Appellant used more force than was reasonable. If the People have not met this burden, you must find Appellant not guilty of [insert crime].

Petitioner was not entitled to the instruction.

Assuming for purposes of this motion petitioner had a constitutional right to defense instructions, that right is limited to cases where there is "evidence sufficient for a reasonable jury to find in [her] favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *see Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Bittaker v. Woodford*, 331 F.3d 715, 728 (9th Cir. 2003) (en banc); *Ceja v. Stewart*, 97 F.3d 1246, 1254 (9th Cir. 1996). The state court's implicit determination that there was insufficient evidence to warrant an instruction amounts to a factual finding that must be presumed correct under 28 U.S.C. § 2254(e)(1). *Tatum v. Dormire*, 183 F.3d 875, 879 (8th Cir. 1999); *Williams v. Withrow*, 328 F. Supp. 2d 735, 748-49 (E.D. Mich. 2004); *cf. Campbell v. Coyle*, 260 F.3d 531, 540 (6th Cir. 2001) (in capital case, state court's finding that there was insufficient evidence to warrant lesser included instruction on involuntary manslaughter was not objectively unreasonable).

The record is fatal to petitioner's claim. First, there was no evidence petitioner owned the property she was allegedly defending, i.e., the flat, excavated property where Ms. Magoc and Ms. Nikiforak were initially standing. Petitioner never established at trial, nor could she have established, that she owned the property on which Ms. Magoc and Ms. Nikiforak were standing at the time petitioner first noticed them and yelled at them to stop the "fucking" chainsaws. In fact, all parties agreed at trial that there was an ongoing boundary dispute between them, that the excavated pad was part of that dispute, and that petitioner and her husband had begun excavating the pad but stopped while ownership was being determined. In *McCarty v. Fremont*, 23 Cal. 196, 198 (1863), the California Supreme Court determined that there is no right to eject a trespasser if the person does not own the property. Because all evidence adduced at trial showed that, at the time of trial, ownership of the excavated pad was, at best, in dispute, petitioner could in no way have been found by a jury to be an "owner" or occupant of that property for purposes of CALCRIM No. 3475. Likewise, Ms. Magoc and Ms. Nikiforak could not be found by any juror

to have "trespassed" for purposes of CALCRIM No. 3475 onto property whose ownership was in dispute.

Petitioner appears to argue that she had the "right to eject trespassers" at the time she brandished her gun at Ms. Magoc and Ms. Nikiforak. As set forth *supra*, however, it was undisputed at trial that at the time she brandished the BB rifle at Ms. Magoc and Ms. Nikiforak, petitioner was on *Ms. Magoc's property*. Thus, based on all of the evidence at trial, petitioner herself was the trespasser in this case. Because the only trespass in this case was petitioner's own trespass on Ms. Magoc's property with a BB rifle, the trial court property denied petitioner's request for CALCRIM No. 3475.

Second, there was no evidence at trial that Ms. Magoc and Ms. Nikiforak, even if trespassing, did not leave within a reasonable amount of time. There was no evidence whatsoever at trial that Ms. Magoc and Ms. Nikiforak, if trespassers, did not leave the disputed parcel within a reasonable amount of time. The testimony at trial was again unequivocal that when petitioner first yelled at Ms. Magoc and Ms. Nikiforak while the latter two stood on the disputed parcel, Ms. Magoc and Ms. Nikiforak turned around and began to walk back to Magoc's residence. 5RT 1058. Ms. Magoc and Ms. Nikiforak, who could have argued that the pad was indeed owned by the Magoc's, instead silently turned around and left. Thus, by the time petitioner brandished her gun at Ms. Magoc and Ms. Nikiforak, both of the women were long gone from the pad, and were well onto what was undisputedly Ms. Magoc's property; they never once turned back towards petitioner's property. Because there was no evidence at trial suggesting Ms. Magoc and Ms. Nikiforak, even if trespassers, did not leave within a reasonable amount of time, the state court denied petitioner's request for CALCRIM No. 3475.

Third, there was no evidence at trial that Ms. Magoc or Ms. Nikiforak posed any threat to petitioner or her property. Petitioner's husband admitted that the two women had no weapons and that he did not feel threatened by Ms. Magoc or Ms. Nikiforak. Neither of the women spoke directly to him or took any threatening action directly toward him or petitioner. Petitioner herself testified that all she saw Ms. Magoc and Ms. Nikiforak do was move their arms in front of them as if they were pointing things out in a conversation. Petitioner could not point to any threatening

9

action on the part of the two women. In fact, the women never engaged petitioner, even after petitioner screamed at them; they did not verbally respond, but instead simply left. As to her horses being agitated by Ms. Magoc's and Ms. Nikiforak's alleged arm movements, petitioner acknowledged that her own screaming and yelling at the two women could have agitated her horses.

Fourth, there was no evidence at trial that petitioner used reasonable force in bringing a gun onto the Magoc property. Indeed, because no evidence showed petitioner owned the excavated parcel, much less the Magoc property, it bears argument that petitioner's screaming and yelling alone, without any gun, was unreasonable. Coupled with the additional facts that Ms. Magoc and Ms. Nikiforak never trespassed onto any property owned by petitioner and were careful not to cross over the temporary boundary line of cedar trees; that Ms. Magoc and Ms. Nikiforak had no weapons and posed no threat to petitioner or her property and fled to their house immediately when petitioner screamed at them; and that it was petitioner herself who trespassed on the Magoc property with a gun in her hands, there is not one fact in evidence supporting the reasonableness of petitioner's actions.

Petitioner attempts to surmount the record by asserting she had a right to "prevent" a "future trespass." Mtn. to Stay at 4-5; Petition at 6-7. Petitioner cites no state authority for the proposition that she could use force to *prevent* a *future* trespass, much less while standing on the *victim's* property. *See* Mtn. to Stay at 4-5; Petition at 6-8. CALCRIM No. 3475 does not allow for such a defense. The state court's implicit determination that petitioner's position was not tenable under state law is beyond review here. *See Jeffries v. Blodgett*, 988 F.2d 923, 936 (9th Cir. 1993).

**B.     The Second Amendment Is Not Implicated In This Case.**

Petitioner contends the Second Amendment protected her conduct here.[5] Mtn. to Stay at 5; Petition at 2-3. The Second Amendment is a red herring here.

---

[5] It is unclear whether the Second Amendment applies at all to "imitation" firearms or BB guns. Our preliminary research has discovered no Supreme Court holding on that question. The absence of such a holding is fatal to petitioner's claim. *See* 28 U.S.C. § 2254(d)(1).

Petitioner relies on *District of Columbia v. Heller*, __ U.S. __, 128 S. Ct. 2783 (2008), and *McDonald v. Chicago*, __ U.S. __, 130 S. Ct. 3020, 2010 U.S. LEXIS 5523 (2010), to contend her brandishing was constitutionally protected. Mtn. to Stay at 5-6. Those cases have no bearing on this case. In *Heller*, the Court struck down a law that "totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable.[6] *Id.* at 2817. The Court acknowledged the Second Amendment right is not unlimited, however, and may be regulated. *See id.* at 2816. *Heller* addressed an absolute ban on possession in the home, while this case concerns a defendant's conduct in walking onto a neighbor's property armed with an "imitation" firearm and threatening those neighbors with it. Contrary to petitioner's suggestion, Mtn. to Stay at 5, *Heller* did not address, much less remotely legalize, petitioner's conduct here. Further, to the extent petitioner claims she was constitutionally entitled to defend her property against future trespass, such argument fails on the record as discussed *supra*.

As we indicated *supra*, petitioner must base her claim on a Supreme Court holding that bears no principled distinction with her circumstance. *Murdoch v. Castro*, __ F.3d __, 2010 U.S. App. LEXIS 12662 (9th Cir. 2010) (en banc). Petitioner relies only on Supreme Court opinions addressing circumstances absent here. The Second Amendment is not implicated here.

### C. Petitioner Was Not Deprived of Notice

Petitioner contends she was not afforded fair warning her conduct was criminal. Mtn. to Stay at 6. She received constructive notice through California Penal Code section 417.4. In the interest of time, respondent will not belabor this point.

## II. PETITIONER WILL NOT BE IRREPARABLY INJURED ABSENT A STAY

Petitioner will suffer no irreparable injury by the denial of a stay. At issue is a single sixty-day jail term which, by petitioner's own estimation, will likely constitute a thirty-day term. Mtn. to Stay at 2. An ordinary federal habeas petitioner may serve years in state prison before a

---

[6] The Court in *McDonald* held that the Second Amendment is applicable to the States. It does not aid petitioner's lack of Supreme Court authority for her proposition that the State may not regulate misuse of firearms or imitation firearms.

resolution—favorable or unfavorable—of her petition on the merits. While we agree petitioner would likely serve her short term in jail before a decision on the merits could be reached herein, her circumstance—serving a term of confinement before a decision on the merits—does not distinguish her from the ordinary federal habeas petitioner.

Petitioner contends that if this Court does not grant her a stay, her federal petition will become moot, and she will effectively be deprived of challenging the constitutionality of her conviction. Mtn. to Stay at 2. She is wrong. The Ninth Circuit has "recognized an irrebuttable presumption that collateral consequences result from any criminal conviction," including a misdemeanor conviction. *Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005). Her conviction will not become moot if a stay is denied. *Id.*

### III. A STAY WILL HARM THE STATE'S INTERESTS

As discussed *infra*, the state has significant interests in finality, comity, and enforcing its own judgments. Those interests will mean little here if petitioner is allowed to block enforcement of her judgment before a decision on the merits, much less issuance of an order to show cause, issues. The State permitted petitioner a stay of her jail term while she pursued direct review, but now that such review is final, wishes to enforce its judgment.

### IV. THE PUBLIC INTEREST LIES WITH RESPONDENT

What lies before this Court is a presumptively valid and final state court judgment. *Barefoot v. Estelle*, 463 U.S. 880, 887-88 (1983); *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938). The "public interest" here is the state's substantial interest in comity and finality, and in enforcing its own judgment. While the state court charitably stayed petitioner's jail term pending her direct review in state court, that review is now complete. The State should not be prevented from enforcing its judgment.

Petitioner, on the other hand, has no interest beyond the ordinary federal habeas petitioner. There is no indication she holds a job, as a physician or not,[7] or has any dependent. She asserts

---

[7] Petitioner appears to assert that a jail term will irreparably injure her because she is a "medical doctor." *See* Mtn. to Stay at 2. Indeed, according to police reports, petitioner screamed at police, "You can't arrest me. I'm a doctor!" She was arrested nonetheless.

12

she has been free on bail for over three years "without incident," has no criminal history beyond the instant conviction, and does not pose a future danger. Mtn. to Stay at 2. As indicated, however, she was granted a stay of her jail term so she could pursue her direct review, which is now final. That she has not violated her probation during that time does not militate a predecision release by this Court.

## CONCLUSION

Accordingly, for the reasons stated, respondent respectfully requests that this Court deny petitioner's request for a stay of her jail term.

Dated: July 27, 2010                    Respectfully Submitted,

EDMUND G. BROWN JR.
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General


/s/ Gregory A. Ott
GREGORY A. OTT
Deputy Attorney General
*Attorneys for Respondent*

20317097.doc

# CERTIFICATE OF SERVICE

| | | | |
|---|---|---|---|
| Case Name: | **Saldinger, Barbara Ann v. Santa Cruz County Superior Court** | No. | **CV 10-3147 SBA** |

I hereby certify that on <u>July 27, 2010</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**OPPOSITION TO MOTION FOR EMERGENCY STAY OF JAIL SENTENCE**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>July 27, 2010</u>, at San Francisco, California.

| M. Argarin | /s/ M. Argarin |
|---|---|
| Declarant | Signature |

20317110.doc